**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **SUSAN WESSON,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 09-CV-561-JHP-FHM** |
| ) | |
| **1. JANE PHILLIPS MEDICAL** ) | |
| **CENTER &AFFILIATES EMPLOYEE** ) | |
| **GROUP HEALTHCARE PLAN,** ) | |
| **PREMIUM PLAN;** ) | |
| **and** ) | |
| **2. JANE PHILLIPS MEDICAL CENTER,** ) | |
| ) | |
| **Defendants.** ) | |

## <u>OPINION & ORDER</u>

Before the Court in ERISA[1] is Plaintiff's Opening Brief on the Merits, Plaintiff's

Response Brief, and Plaintiff's Reply Brief;[2] and the Opening Brief of Defendants Jane Phillips

Medical Center and Jane Phillips and Affiliates Employee Group Health Care Plan, the Response

Brief of Defendants Jane Phillips Medical Center and Jane Phillips and Affiliates Employee

Group Health Care Plan, and the Reply Brief by Defendants Jane Phillips Medical Center and

Jane Phillips and Affiliates Employee Group Health Care Plan.[3] For the reasons cited herein,

Defendant JPMC's final determination denying medical benefits is **AFFIRMED**. Plaintiff's

claim for Breach of Fiduciary Duty is **DENIED**.

---

[1]The parties have stipulated that this case is governed by ERISA. Joint Status Report at 3, Docket No. 26.

[2]Docket No.'s 42, 50, and 56.

[3]Docket No.'s 43, 48, and 57.

1

**BACKGROUND**

**A. Policy Coverage and Provisions**

Throughout 2005 and 2008, the relevant years in this case, Plaintiff was an employee of Defendant Jane Phillips Medical Center ("JPMC") and was a participant in JPMC's group health plan ("Plan").[4] The Plan is a self-funded employee health plan with funds coming from both employee contributions and employer contributions made by Defendant JPMC.[5] In April 2005, Plaintiff underwent a Roux-en-Y gastric bypass weight loss surgery to treat obesity.[6] The 2005 bypass surgery was covered by the Plan and benefits were paid to the extent of the Plan's maximum lifetime treatment coverage of $15,000 for morbid obesity.[7] The relevant Plan language regarding maximum lifetime treatment coverage reads:

> Morbid Obesity – The Plan covers obesity treatment if such treatment is deemed Medically Necessary and diagnosed as a condition in which an individual is obese as defined by the National Heart, Lung, and Blood Institute, and its guidelines of 1998 if the following criteria is met: (1) A body mass index of 40 or over 35 if the patient has other existing co-morbid diagnosis (as determined by the Body Mass Index table). (2) The patient is evaluated by a surgeon, psychiatrist and nutritionist. (3) The patient selects a surgeon with experience in gastric bypass surgery procedures. (4) A plan of treatment is submitted by the surgeon to case management for review. Treatment of complications (to include other organs), as a result of obesity services(s) will not be covered by this Plan. See your Plan Supervisor for a

---

[4]*See generally* Administrative Record, Docket Nos. 32, 37, 64. The Administrative Record has been submitted to the Court at Docket No.'s 32, 37, and 64 and is labeled "Wesson Administrative Record" (Admin. Rec.) 1 - 180.

[5]Plaintiff's Opening brief at 2, Docket No. 42.

[6]*See* Admin. Rec. at 18-19.

[7]*Id*. 15-16, 105.

copy of the institute's guidelines as well as the Medical Exclusions and Limitations in this booklet for more information.

Payment under this benefit will be limited to: Lifetime Maximum of $15,000.[8]

In 2008 Plaintiff experienced health problems, such as depression, lack of appetite, acid reflux, inability to keep solid foods down, and weight loss.[9] Plaintiff sought treatment for these symptoms from her doctors and ultimately underwent two dilation procedures and a surgery to repair an area of gastric stricture.[10] The operative note from the July 2008 surgery states that the operation performed was a "[t]akedown of the gastrojejunostomy with reconstruction."[11]

## B. Administrative Adjudication of Plaintiff's Claim.

Plaintiff sought coverage for these 2008 doctor visits and medical procedures by submitting health insurance claims to the Plan.[12] Plaintiff's initial claim was denied by Plan Supervisor BMI HealthPlans, Inc. (BMI).[13] Plaintiff sought review of the initial decision, with Plan supervisor BMI receiving the request for review on September 15, 2008.[14] Plaintiff's request for review included no supporting supplemental information.[15]

On October 8, 2008 BMI issued its decision, confirming the denial of Plaintiff's claim, citing

---

[8]*Id.* at 105.

[9]*Id.* at 18-19.

[10]*See id.* at 55-57, 69-70.

[11]*Id.* at 65.

[12]*See id.* 3-13.

[13]*See i*d. at 18-20, 163-80.

[14]*See id.* at 18-20, Defendants' Opening Brief at 3, Docket No. 43.

[15]*See id.*

that Plaintiff's claim exceeded the Plan's $15,000 lifetime limit for medical services connected with morbid obesity based on its determination that the 2008 procedures resulted from a complication of the original 2005 gastric bypass.[16] The denial letter advised Plaintiff of her right to appeal the decision to the Plan Administrator and the procedure for pursuing that appeal.[17] The letter specifically stated that Plaintiff must submit any supplemental material supporting her claim along with her notice of appeal.[18]

On January 9, 2009, Plaintiff initiated an appeal to Plan administrator JPMC.[19] Plaintiff disagreed with BMI's determination that the 2008 procedures resulted from a complication of the original 2005 gastric bypass, arguing instead that the gastric obstruction was caused by stress and the resulting chronic acid reflux.[20] With her notice of appeal, Plaintiff submitted multiple articles supporting her contention.[21]

Defendant JPMC gathered all of Plaintiff's appeal materials and the medical records related to the 2008 surgeries and submitted them to HealthReview, L.L.C., an independent medical review company.[22] Notably absent from the records was any record of the 2005 procedure. A registered nurse from HealthReview, L.L.C. reviewed the materials submitted by JPMC and concluded that

---

[16]*See id.* at 50.

[17]*Id.*

[18]*Id.*

[19]*Id.* at 52-53.

[20]*See id.* at 57.

[21]*See id.* at 23-48.

[22]*Id.* at 83.

Plaintiff's 2008 surgeries were the result of complications arising from the 2005 procedure.[23]

Defendant JPMC then submitted the materials to AllMed Healthcare Management (AllMed) for further independent medical review.[24] The independent review, by Dr. Skip Freedman, stated that he reviewed all submitted material and concluded that "[t]his surgery was done for a condition that was a result of the prior gastric bypass procedure."[25] Lacking any records from Plaintiff's 2005 procedure, Dr. Freedman's report assumed that Plaintiff's 2005 surgery was a vertical banded gastroplasty, rather than the Roux-en-Y gastric bypass Plaintiff actually received.[26] Based on Dr. Freedman's report, Defendant JPMC affirmed the denial of Plaintiff's claim.[27] On August 31, 2009, having exhausted all administrative remedies, Plaintiff filed her claim in this court.[28]

## C. Relevant Procedural Background

In her Complaint, Plaintiff states claims for (1) enforcement of ERISA benefits under the plan, and (2) breach of fiduciary duty.[29] The initial Administrative Record was filed with this court on April 23, 2010.[30] On September 30, 2011, this Court granted partial summary judgment in favor of Defendant BMI, finding that Defendant BMI was a non-fiduciary third-party administrator of the

---

[23]*Id.* at 83, 87.

[24]*Id.* at 79-80.

[25]*Id.* at 79-80.

[26]*Id.* at 79.

[27]*Id.* at 89.

[28]*See id.* at 89; *see generally* Complaint, Docket No. 2.

[29]*See id.* at 6-7.

[30]*See* Docket No. 32.

plan and was therefore not subject to suit for either recovery of benefits under ERISA or for breach of fiduciary duty.[31] As such, JPMC is liable for any of BMI's actions that may have contradicted ERISA law and/or resulted in a breach of JPMC's fiduciary duties.[32] The case is fully briefed pursuant to an ERISA schedule and properly before the Court.

## DISCUSSION

**A. Standard of Review**

Here, it is uncontested that the language of the plan clearly gives JPMC ultimate authority to determine eligibility benefits and construe the terms of the plan.[33] The law is quite clear on this point: "If the plan grants discretionary authority to the administrator or fiduciary, the exercise of that authority will be set aside only if it is arbitrary or capricious."[34]

The Court accepts Plaintiff's contention that JPMC's position as both the final arbiter of Plaintiff's claims and the payor of those claims creates an inherent conflict of interest.[35] However, such conflicts do not necessitate a change in the standard of review.[36] Rather, the existence of a conflict is merely a factor the Court should consider in a "combination of factors" analysis.[37] Finally,

---

[31]*See* Opinion and Order at 7, Docket No. 68.

[32]*See id.* at 3-4, n.4, Docket No. 68 (citing *Geddes v. United Staffing Alliance Emp. Med. Plan*, 469 F.3d 919, 926 (10th Cir.2006).

[33]Plaintiff's Opening Brief at 11, Docket No. 42.

[34]*Nance v. Sun Life Assurance Co. of Canada*, 294 F.3d 1263, 1267-68 (10th Cir.2002) (*citing Chambers v. Family Health Plan Corp.*, 100 F.3d 818, 825 (10th Cir.1996)).

[35]*See* Plaintiff's Opening Brief at 11-12, Docket No. 42.

[36]*Holcomb v. Unum Life Ins. Co. of America*, 578 F.3d 1187, 1192-93 (10th Cir.2009).

[37]*Id.*

because JPMC bears ultimate responsibility for the benefits determination, the Court's focus is on JPMC's final determination of benefits, weighing the apparent conflict of interest and holding JPMC accountable for any procedural errors committed by BMI.

## B. Defendants' Review of Plaintiff's Claims

In analyzing Defendants' review of Plaintiff's claims, the Court first reviews Plaintiff's allegations regarding BMI's failure to comply with the requirements of ERISA in its explanation of benefits (EOB) and claim denial letters.[38] The Court reviews the ultimate decision of JPMC under the arbitrary and capricious standard, weighing as a factor any conflict of interest raised by JPMC being both a plan administrator and claims payor.

### 1. Initial BMI Review

Plaintiff alleges that the EOB forms notifying Plaintiff of the initial denial of benefits are inadequate under ERISA procedure.[39] "In notifying a claimant of its initial denial, a plan administrator must state both '[t]he specific reason or reasons for the adverse determination' and '[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary.'"[40]

ERISA procedure requires that an administrator's reason for denial "must be stated in reasonably clear language."[41] In assessing whether or not an administrator failed to meet this or any

---

[38]*See* Plaintiff's Supplemental Response to BMI-Healthplans Amended Administrative Record (Plaintiff's Supplemental Response) at 4, Docket No. 65.

[39]*Id.* at 2-3.

[40]*Metzger v. UNUM Life Ins. Co. of America*, 476 F.3d 1161, 1168, n.4, (10thCir.2007)(*citing* 29 C.F.R. § 2560.503-1(g)).

[41]*Gilbertson*, 328 F.3d at 635 (*citing Booton v. Lockheed Medical Benefit Plan,* 110 F.3d 1461, 1463 (9th Cir.1997).

other procedural requirement, the Court looks for "substantial compliance" with ERISA procedure, with particular focus on the purpose of the procedural requirement.[42] The intent of the requirement at issue is very clearly to provide a claimant with enough information to understand and challenge a claim denial.

The Court first questions whether or not BMI's initial determination clearly stated the specific reason or reasons for the claim denial as required by ERISA. The initial EOB form letters received by Plaintiff state only that the type of service rendered was "Weight Control PI" and that Plaintiff's claims exceed the maximum plan allowance.[43] The letters do not, however, clearly state what plan allowance has been exceeded. Further, not all of the EOB letters deny Plaintiff's claims.[44]

Defendant argues that these are sufficient to clearly convey the specific reason for denial of Plaintiff's claims so that Plaintiff could understand and challenge the denial.[45] Plaintiff disagrees, arguing that she could not reasonably anticipate from the plain language of the EOB letters that the denial was predicated on the weight control/morbid obesity allowance and that further confusion arises when one considers that BMI had paid for doctor visits related to the Plaintiff's "Weight Control PI" procedures and surgery but denied claims for the actual procedures.[46]

Plaintiff's argument is undercut by the information presented in her initial appeal letter to

---

[42]*Id.* at 634-35.

[43]*Id.* at 163-80.

[44]*See id.* at 171-74.

[45]*See* Reply by Defendants to Plaintiff's Supplemental Response at 2, Docket No. 66.

[46]*See* Plaintiff's Supplemental Response at 7-8, Docket No. 65. *See also* Admin. Rec.at 163-170; 175-80; *but see id.* at 171-74.

BMI.[47] In it she states: "I understand the need to limit benefits for bariatric coverage due to the different available methods and that there are some individuals that would abuse the benefit in the event that one was not successful."[48] This letter demonstrates that Plaintiff understood that the claims were denied under the Plan's limitation of benefits for procedures related to morbid obesity treatment, and Plaintiff was able to perfect an appeal of that decision. As a result, the Court finds that BMI was substantially compliant with ERISA procedures with regard to the initial denial notices.

2. Plaintiff's Request for Review to BMI

Plaintiff also alleges that the notification provided by BMI's October 8, 2008 denial letter regarding her request for review was "woefully inadequate," as BMI did not provide an evidentiary basis for its conclusion that Plaintiff's 2008 procedures were the result of complications from her 2005 operation.[49] The Court recognizes that Plaintiff is entitled by statute to a "full and fair review" of any denial of benefits.[50] In order to permit such a review, a notice of decision must include:

> (i) The specific reason or reasons for the adverse determination;
> (ii) Reference to the specific plan provisions on which the determination is based;
> (iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;
> (iv) A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on

---

[47]*See* Admin. Rec. at 19-20.

[48]*Id.* at 19.

[49]Plaintiff's Opening Brief at 14-15, Docket No. 42, Plaintiff's Supplemental Response to BMI-Healthplan's Amended Administrative Record at 10, Docket No. 65.

[50]29 U.S.C. §1133.

review.[51]

Further, if the adverse benefit determination is based on an exclusion or limit, the administrator must provide either an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances, or a statement that such explanation will be provided free of charge upon request.[52] These requirements ensure that a full and fair review is conducted by the administrator, enable the claimant to adequately prepare for further administrative review, and make it possible for the reviewing authority to perform the task of reviewing that denial.[53]

The October 8, 2008 letter states that (a) the reviewer relied on the claims previously processed in order to come to its decision, that (b) the reviewer's clinical judgment was that the procedures were the result of complications arising from a previous bariatric surgery, and that (c) plan language, provided in the letter, specifically barred claims related to complications arising from the surgery. Although not particularly informative, it comports with the notice requirements of 29 C.F.R. §2560.503-1(g) in that it (a) states the specific reason for the adverse determination, including the evidence used to come to that determination (b) references the specific plan language on which the determination was based, and (c) explained the clinical judgment of the reviewer by applying specific terms of the plan to Plaintiff's 2008 medical procedures based on the information contained in the claims for benefits.

Plaintiff also contends that BMI failed to inform her of what documentation or other

---

[51]29 C.F.R. § 2560.503-1(g)(1)(i)-(iv).

[52]29 C.F.R. § 2560.503-1(g)(v)(B).

[53]*See Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 693 (7thCir.1992).

evidence she might consider submitting.[54] Plaintiff is correct in asserting that section (g)(1)(iii) requires that a denial of benefits notification must include: "[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary."[55] However, Plaintiff does not claim that BMI did not provide her with the information necessary to perfect an appeal. Plaintiff argues that BMI failed to tell her what documents might be helpful in making her case for a claim.[56] This is not what is required by the statute. BMI notified Plaintiff of, and Plaintiff submitted, all the appropriate materials necessary to perfect an appeal to Plan Administrator JPMC. The statute requires nothing more.

Addressing Plaintiff's protestations that BMI's notice failed to provide a "meaningful dialogue" between a claimant and the claims administrator as required by the statute,[57] the Tenth Circuit, adopting the language of the Ninth Circuit, set out the elementary nature of this exchange:

> In simple English, what this regulation calls for is a meaningful dialogue between ERISA plan administrators and their beneficiaries. If benefits are denied . . . the reason for the denial must be stated in reasonably clear language, . . . if the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it. There is nothing extraordinary about this: it's how civilized people communicate with each other regarding important matters.[58]

---

[54]Plaintiff's Supplemental Response to BMI-Healthplan's Amended Administrative Record at 10, Docket No. 65.

[55]29 C.F.R. § 2560.503-1(g)(1)(iii).

[56]See Plaintiff's Response Brief at 12, Docket No. 50 ("[N]or does BMI anywhere in that letter identify or suggest to [Plaintiff] what documents or evidence she might submit on appeal that might be helpful to support her claim for benefits").

[57]*Gilbertson v. Allied Signal, Inc.* 328 F.3d 625, 635 (10thCir.2003).

[58]*Id.*(*citing Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir.1997)).

The BMI denial letter sets out that Plaintiff's claim was denied because the 2008 procedures and surgeries were found to be the result of complications from the 2005 obesity surgery. Further, Plaintiff was informed that she could submit supplemental material if she wished. However, the plan administrators apparently did not believe they needed more information to make a reasoned decision on appeal and therefore did not ask for it. Nothing more is needed to establish the "meaningful dialogue" contemplated by the statute.

Finally, Plaintiff also alleges that BMI's October 8, 2008 denial letter failed to inform Plaintiff she was entitled to be represented in pursuing her claims and failed to describe additional material that was needed to perfect her claim.[59] The statutory basis cited by Plaintiff supporting her contention is 29 C.F.R. §2560.503-1(c)(3), which reads:

> (3) To the extent that a plan offers voluntary levels of appeal (except to the extent that the plan is required to do so by State law), including voluntary arbitration or any other form of dispute resolution, in addition to those permitted by paragraph (c)(2) of this section, the claims procedures provide that:
>
> ***
>
> (iii) The claims procedures provide that a claimant may elect to submit a benefit dispute to such voluntary level of appeal only after exhaustion of the appeals permitted by paragraph (c)(2) of this section;
>
> (iv) The plan provides to any claimant, upon request, sufficient information relating to the voluntary level of appeal to enable the claimant to make an informed judgment about whether to submit a benefit dispute to the voluntary level of appeal, including a statement that the decision of a claimant as to whether or not to submit a benefit dispute to the voluntary level of appeal will have no effect on the claimant's rights to any other benefits under the plan and information about the applicable rules, the claimant's right to representation, the process for selecting the decisionmaker, and the circumstances, if any, that may affect the impartiality of the decisionmaker, such as any financial or personal interests in the result or any past or present relationship with any party to the review process;

Section (c)(2) of 29 C.F.R. §2560.503-1, referenced above, states that a claims procedure

---

[59]Plaintiff's Response Brief at 12, Docket No. 50

will be deemed reasonable if:

> "[t]he claims procedures do not contain any provision, and are not administered in a way, that requires a claimant to file more than two appeals of an adverse benefit determination prior to bringing a civil action under section 502(a) of the Act."

Reading these two statutory sentences in conjunction, one can clearly see that section (c)(3) addresses the reasonableness and delineates the standards for a voluntary appeals process outside the maximum two mandatory appeals allowed under 29 C.F.R. §2560.503-1(c)(2). As such, the "upon request" standards regarding notification of a claimant's right to representation outlined in section (c)(3) are inapplicable to the instant case, as Plaintiff is seeking relief in this Court based on her mandatory appeals, rather than an additional voluntary appeal or arbitration process. Plaintiff offers no other statutory language that purports to require notice of a right to representation.

Ultimately, the October 8, 2008 denial letter notified Plaintiff as to the basis of BMI's findings and provided Plaintiff with adequate notice from which she could perfect an appeal to the plan administrator. Consequently, the Court finds that BMI substantially complied with ERISA notification requirements with regard to the October 8, 2008 review and denial letter.

### 3. JPMC Appeal

It is uncontested that the language of the plan gives JPMC the ultimate authority to determine eligibility benefits and construe the terms of the plan.[60] "If the plan grants discretionary authority to the administrator or fiduciary, the exercise of that authority will be set aside only if it is arbitrary or capricious."[61] Under the arbitrary and capricious standard, the Court's inquiry is limited to

---

[60]Plaintiff's Opening Brief at at 11, Docket No. 42.

[61]*Nance v. Sun Life Assurance Co. of Canada*, 294 F.3d 1263, 1267-68 (10th Cir.2002) (*citing Chambers v. Family Health Plan Corp.*, 100 F.3d 818, 825 (10th Cir.1996)).

whether the claims decision was "reasonable and made in good faith."[62] The Court will not substitute its own judgment for that of the plan administrator unless the administrator's actions are without any reasonable basis.[63] The Court recognizes that the instant Defendant both determines and pays benefits, creating an inherent conflict of interest in this case. The Court weighs that conflict accordingly in its analysis.[64]

Plaintiff's alleges that JPMC failed to rely on substantial evidence in making the determination to deny her claim.[65] Lack of substantial evidence supporting the claims decision is one indicia that a plan administrator's decision is arbitrary and capricious.[66] "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decisionmaker."[67] "Substantiality of the evidence is based upon the record as a whole."[68] In determining whether the evidence in support of the administrator's decision is substantial, the Court must take into account anything in the record, including conflicts of interest, that fairly detracts from its weight.[69]

---

[62] *Geddes v. United Staffing Alliance Employee Medical Plan*, 469 F.3d 919, 929 (10th Cir.2006) (*internal citations omitted*).

[63] *Id.*

[64] *See Holcomb v. Unum Life Ins. Co. of America*, 578 F.3d 1187, 1192-93 (10th Cir.2009) (embracing a combination-of-factors method of review).

[65] *See* Plaintiff's Opening Brief at 19-21, Docket No. 42; Plaintiff's Supplemental Response to BMI-Healthplan's Amended Administrative Record at 10, Docket No. 65.

[66] *Caldwell v. Life Ins. Co. of North America*, 287 F.3d 1276, 1282 (10th Cir.2002).

[67] *Id.* (*internal quotations omitted*).

[68] *Id.*

[69] *Id.* (*internal quotations omitted*).

Here the Administrative Record shows that JPMC first contacted HealthReview, L.L.C. to perform an independent review of Plaintiff's claim, specifically stating "I am particularly interested to know if he/she can comment on whether a person who had not had the bypass procedure would have experienced the same stricture issue under the stressful circumstances."[70] An initial nurse's review of the claims stated that the 2008 claims were the result of complications from the 2005 surgery.[71] It was then that JPMC sent the claims to Dr. Skip Freedman at AllMed for further independent review.[72]

JPMC does admit that the nurse's findings were secondary considerations to Dr. Freedman's report, and it was Dr. Freedman's report on which it primarily based its decision to refuse benefits.[73] Dr. Freedman was specifically asked to issue a report on the following question: "Were the patient's problems with gastric outlet stricture resulting from her previous gastric bypass or is this a non-related condition?"[74] During the preparation of his report, Dr. Freedman was admittedly lacking the medical records related to Plaintiff's 2005 bariatric surgery.[75] Lacking those records, Dr. Freedman

---

[70]Admin. Rec. 83-87. Plaintiff alleges these are merely hearsay statements, and were not available to Plaintiff until after filing of this suit. Plaintiff's Response Brief at 8, Docket No. 50. The record indicates that the Plan Administrator relied on this evidence to some degree, before requesting further physician review, therefore it is relevant to the Court's inquiry. As the emails were used in the determination of the final appeal, JPMC was not required to produce them to Plaintiff until after the review was complete. *See Metzger*, 476 F.3d 1161.

[71]Admin. Rec. at 83.

[72]*Id.* at 85.

[73]Reply Brief by Defendants Jane Phillips Medical Center & Affiliates Employee Group Healthcare Plan and Jane Phillips Medical Center at 6-7, Docket No. 57.

[74]Admin. Rec. at 79-80.

[75]*Id.*

incorrectly includes in his report that the 2005 surgery was "presumably a vertical banded gastroplasty."[76] Plaintiff argues that Dr. Freedman's presumption that Plaintiff underwent a vertical banded gastroplasty, rather than the Roux-en-Y procedure she actually received, makes the evidence provided by Dr. Freedman's report less than substantial.[77] The Court tends to agree.

A very cursory review of Dr. Freedman's citations reveals that a "vertical banded gastroplasty" is not a "gastric bypass" at all.[78] In making the presumption that Plaintiff's 2005 surgery was a vertical banded gastroplasty, Dr. Freedman wholly ignores the question presented to him by JPMC: "Were the patient's problems with gastric outlet stricture resulting *from her previous gastric bypass* or is this a non-related condition?"[79] This mistake is further complicated by the fact that Dr. Freedman ultimately concludes that the 2008 surgery "was done for a condition that was the result of the *prior gastric bypass procedure.*"[80]

The fact that Dr. Freedman apparently remained unaware of the actual procedure performed in 2005, despite being informed of the basic nature of the procedure in the question presented by JPMC, causes the Court to question Dr. Freedman's diligence in preparing the report. Further, Dr. Freedman's faulty presumption that Plaintiff underwent a vertical banded gastroplasty, followed by reference to a gastric bypass in his conclusion demonstrates either loose language in reference to

---

[76]*Id.*

[77]Plaintiff's Opening Brief at 20-21, Docket No. 42.

[78]*See* Admin. Rec.. at 80 ("Van Gemert WG, Van Wersh MM, Greve JW, Soeters PB. Revisional Surgery after failed vertical banded gastroplasty:restoration of vertical banded gastroplasty *or conversion to gastic bypass. Obesity Surg* 1998 Feb; 8(1):21-8") (*emphasis in citation added*).

[79]*Id.* at 79-80 (*emphasis added*).

[80]*Id.* (*emphasis added*).

varying bariatric procedures or ignorance of the procedures in general. Such imprecision in a field that demands precision is unacceptable. As such, the Court cannot find that this report, standing by itself, is "evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decisionmaker."[81]

However, Dr. Freedman's report was not the only evidence available to JPMC in making the determination on Plaintiff's claims. The Administrative Record before JPMC also included the informal response by the HealthReview, L.L.C. nurse and, more importantly, the operative notes and medical records related to Plaintiff's 2008 procedures and surgery. Review of the 2008 medical records reveals that Plaintiff was having some dysfunction with the Silastic ring, a medical device implanted during her 2005 procedure, which required the first two dilation procedures.[82] Further, Plaintiff's 2008 operative note reveals that her surgery required a "[t]akedown of the gastrojejunostomy with reconstruction."[83] Like the Silastic ring, the gastrojejunostomy is not a natural occurring phenomenon, but a surgical creation.[84] The gastrojejunostomy was created during Plaintiff's 2005 procedure, and the fact that it required reconstruction in 2008 is indicative that Plaintiff's health problems were related in some fashion to the 2005 surgery.[85]

Ultimately, because Plaintiff would have neither the Silastic ring, nor the gastrojejunostomy absent the 2005 surgery, it is reasonable to conclude that none of the 2008 procedures would be

---

[81]*Id.* (*internal quotations omitted*).

[82]*Id.* at 74-75.

[83]*Id.* at 65.

[84]*See* Response Brief of Defendants Jane Phillips Medical Center and Jane Phillips & Affiliates Employee Group Healthcare Plan at 10-11, Docket No. 48.

[85]*See id.*

necessary but for the 2005 procedure. Because the 2008 procedures and surgery were specifically to correct problems related to the 2005 operation, the 2008 procedures and surgery can reasonably be considered treatment for complications stemming from the 2005 procedure. The complete and reasonable nature of this evidence also greatly diminishes Plaintiff's argument that JPMC's role as final arbiter and claims payor influenced its adverse determination of Plaintiff's claims in this instance. As such, the conflict weighs little in the Court's "combination of factors" review.

Finally, Plaintiff's allegations that JPMC did not consider that Plaintiff's condition may have been brought on by stress and that JPMC ignored the medical "evidence" she provided during the BMI review are without merit.[86] JPMC does not contest Plaintiff's contention that the complications may have been caused by stress.[87] The "evidence" submitted by Plaintiff, consisted of six articles of varying credibility, discussing esophageal damage and strictures caused by stress-related gastroesophageal reflux disease (GERD).[88] None of the articles presented discuss whether or not GERD could create the gastric outlet stricture from which Plaintiff was suffering or that such a gastric outlet stricture could result in the absence of a prior gastric bypass procedure.

The articles point out that GERD can result in *esophageal strictures*, among other esophageal problems.[89] Despite admittedly suffering from this damaging condition, Plaintiff's medical records

---

[86]Plaintiff's Opening Brief at 16, 20, Docket No. 42.

[87]*See* Response Brief of Defendants Jane Phillips Medical Centerand Jane Phillips & Affiliates Employee Group Healthcare Plan at 11, Docket No. 48.

[88]*See* Admin Rec. at 23-48, 58 (articles include *Esophogeal Stricture*; *The Effect of Life Stress on Symptoms of Heartburn*; *Stress and Heartburn: a Biobehavioral Perspective*; *Diagnosis of Gastroesophageal Reflux Disease and Heartburn*; *Stress, Sickness, and Divorce*; *The Serious Consequences of GERD*).

[89]*Id.*

indicate that her esophageal function was normal.[90] The fact that Plaintiff's GERD had not impacted her otherwise normal esophageal tissue severely undercuts her position that her GERD alone, rather than GERD in combination with complications related to the previous bariatric surgery, resulted in Plaintiff's gastric outlet strictures. As such, the articles were, at best, wholly irrelevant to Plaintiff's claims, and, at worst, serve to dispute Plaintiff's theory of injury. JPMC's failure to explicitly note the articles in its determination letter does not detract from its full and fair review of Plaintiff's claims.

The law is clear: the Court cannot substitute its own judgment for that of the plan administrator unless the administrator's actions are without any reasonable basis.[91] The Court finds that the 2008 medical records and operative notes, along with the HealthReview, L.L.C. nurse's opinion, Dr. Freedman's ultimate conclusion that the 2008 surgeries were the result of complications from a prior gastric bypass procedure, and the reasonable inferences that can be drawn from Plaintiff's relatively normal esophageal health in spite of the GERD discussed in the submitted articles constitute substantial evidence that Plaintiff's 2008 procedures and surgery were related to complications arising from Plaintiff's 2005 gastric bypass procedure. This accumulation of evidence offered JPMC a reasonable basis for its determination that Plaintiff's claims were barred by the Plan's exclusion of treatment for complications resulting from obesity services. Further, the Court finds no competent evidence or argument that Plaintiff did not receive a full and fair review of her claims for the 2008 procedures and surgery. Finally, the Court finds, based on the evidence, that

---

[90]*Id.* at 61-62 (medical records include drawings with notations "eso. -normal;" "stomach normal").

[91]*Geddes*, 469 F.3d at 929 (*internal citations omitted*).

JPMC's determination would likely be the same regardless of any conflict of interest. As Plaintiff received a full and fair review of her claims, and Defendant JPMC had a reasonable basis for denial of Plaintiff's claims, the Court finds that Defendant JPMC's denial of Plaintiff's 2008 claims was not arbitrary and capricious.[92]

## C. Breach of Fiduciary Duty

Plaintiff's Complaint includes an allegation that "[i]n the denial of benefits for the 2008 surgery and related expenses, [ ]JPMC [ ] breached their fiduciary duties to [Plaintiff]."[93] Although this Court's findings above refute this claim in principal, Plaintiff also alleges in her briefing that JPMC breached its fiduciary duty because it failed to segregate employee contributions to the Plan into an interest-bearing trust account separate from JPMC's general operating account.[94] Plaintiff's argument that JPMC places employee contributions in its general operating account is specifically refuted by the affidavit of JPMC Chief Financial Officer Michael Moore, therefore all that is at issue is whether or not JPMC is required to keep employee contributions in a separate, interest-bearing, trust account.[95] Party argument on both sides of this issue is notably sparse.

Although ERISA §404(a)(1) states that Plan assets "shall be held for the exclusive purposes

---

[92]Even if the Court were to accept Plaintiff's contention that JPMC's review was based solely on Dr. Freedman's report, after its thorough review of the record, the Court is convinced that JPMC would arrive at its previous conclusion denying benefits even after thorough consideration of all relevant evidence. Consequently, remand to JPMC for further review is unnecessary and inappropriate. *See Rekstad v. U.S. Bancorp*, 451 F.3d 1114, 1121 (10thCir.2006) (*citing Quinn v. Blue Cross & Blue Shield Ass'n.,* 161 F.3d 472, 478 (7th Cir.1998)).

[93]Complaint at 7, Docket No. 1

[94]Plaintiff's Opening Brief at 23, Docket No. 42.

[95]*See* Plaintiff's Response Brief at 13-14, Docket No. 50*; but see* Affidavit of Michael Moore at 1-2, Docket No. 48-1.

of providing benefits to participants in the plan and their beneficiaries," nothing in the statute states that such funds must be segregated into separate interest-bearing trust accounts. The Tenth Circuit has also not addressed whether or not ERISA employee contributions to healthcare plans must be segregated into interest bearing trust accounts, and Plaintiff has offered no other case law to support her allegation. In fact, JPMC's decision not to segregate plan funds into a separate trust account appears to comport with standard industry practice with regard to welfare plans, including healthcare plans like the one at issue here.[96]

The Second Circuit, in *Nechis v. Oxford Health Plans, Incorporated* has addressed this issue to some degree. In *Nechis*, the Circuit Court upheld a district court finding that a plan administrator had no obligation to segregate the plan premiums from the general operating account.[97] Nechis, an individual unable to seek money damages under §502(a)(2), sought equitable restitution under §503(a)(3).[98] The Circuit Court stated that a constructive trust or equitable lien requiring equitable restitution is imposed "when, 'in the eyes of equity,' a plaintiff is 'the true owner' of funds or property, and the money or property identified as belonging in good conscience to the plaintiff [can] clearly be traced back to particular funds or property in the defendant's possession."[99] The Second Circuit found that Nechis was not a "true owner" in this sense, as "the monies upon which Nechis seeks to impose a trust are premiums paid for health care coverage, which Oxford [Health Plans

---

[96]*See, e.g.,* Eric D. Chason, *Redressing All Fiduciary Breaches Under Section 409(a)*, 83 TEMPLE L.REV. 147, 150-51 (2010) ("While welfare plans may be 'fiduciary relationships,' the relationship is often not one 'with respect to property' because benefits are paid directly from the employer's general assets rather than a segregated trust fund")

[97]*See Nechis*, 421 F.3d 96, 103-04 (2nd Cir.2005) (*internal citations and quotations omitted*).

[98]*Id.*

[99]*Id.*

Inc.] is under no obligation to segregate."[100]

As in *Nechis,* the instant Plaintiff apparently seeks to impose a constructive trust on employee contributions to the Plan that would obligate it to segregate employee contributions to the Plan into a separate, interest-bearing trust account.[101] However, as in *Nechis*, the instant Plaintiff paid monies into the Plan for health coverage, and such monies cannot, in good conscience, be considered as still belonging to Plaintiff.[102] As such, these employee contributions are analogous to the plan premiums at issue in *Nechis* and are similarly not subject to an equitable lien or constructive trust that would obligate JPMC to segregate the funds into an interest-bearing trust account.

Ultimately, in order for an ERISA plaintiff to prevail on a breach of fiduciary duty claim under ERISA §409, "there must be a showing of some causal link between the alleged breach and the loss plaintiff seeks to recover."[103] In other words, JPMC cannot be liable for breaching its fiduciary duty unless Plaintiff can demonstrate both that JPMC breached its fiduciary duty and that losses to the Plan or ill-gotten profit to the fiduciary accrued in relation to that breach.[104]

Because, JPMC is not obligated to segregate Plan premiums as Plaintiff contends, Plaintiff

---

[100]*Id.*

[101]*See* Plaintiff's Opening Brief at 23, Docket No. 42 ("E. The Plan Administrator Breaches its Fiduciary Duty to Plan Beneficiaries by Failing to Maintain Employee Contribution in a Separate Interest-Bearing Trust Account, or Other Prudent Investment, and Instead Comingles Employee Contributions With General Operating Funds").

[102]*See Nechis*, 421 F.3d 96 at 103-04

[103]*Holdeman v. Devine,* 572 F.3d 1190, 1193 (10th Cir.2009) (*internal quotations and citations omitted*).

[104]*Holdeman v. Devine*, No. 2:02-CV-00365 PGC, 2007 WL 3254969, *11 (D.Utah 2007).

cannot demonstrate a breach of any duty. Further, Plaintiff has offered no competent evidence that this alleged breach resulted in losses to the Plan, denial of Plaintiff's benefits, or ill-gotten gains to JPMC. As Plaintiff has failed to offer evidence supporting either prong of the standard set forth by the Circuit, Plaintiff's claim for breach of fiduciary duty based on JPMC's failure to segregate employee contributions from its general operating funds must be **DENIED**.

## CONCLUSION

For the reasons cited herein, Defendant JPMC's final determination denying medical benefits payable to Plaintiff Wesson is hereby **AFFIRMED**. Plaintiff's claim for breach of fiduciary duty is **DENIED**. A separate Judgment is filed herewith.

James H. Payne
United States District Judge
Northern District of Oklahoma